Lionel Z. Glancy (Bar No. 134180)
lglancy@glancylaw.com
Michael Goldberg
mgoldberg@glancylaw.com
GLANCY BINKOW & GOLDBERG LLP
1801 Ave. of the Stars, Suite 311
Los Angeles, California 90067
Tel: (310) 201-9150
Fax: (310) 201-9160

Ira M. Press
ipress@kmslaw.com
Mark A. Strauss (Bar No. 196471)
mstrauss@kmslaw.com
Beverly Tse (Bar No. 237240)
btse@kmslaw.com
KIRBY MCINERNEY & SQUIRE, LLP
830 Third Avenue, 10th Floor
New York, New York 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

Brian Murray
bmurry@murrayfrank.com
MURRAY FRANK & SAILER, LLP
275 Madison Avenue, Suite 801
New York, New York 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

*Co-Lead Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN CROWELL, BENJAMIN LAPIN AND REUVEN LAPIN, on plaintiffs' own behalves and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> DAVID H. MCCORMICK, ROBERT M. CALDERONI and ARIBA, INC., <br><br> Defendants. | Case No. 3:06-CV-05575-MHP <br><br> Assigned to Hon. Marilyn Hall Patel <br><br> Class Action <br><br> **AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> Demand for Jury Trial |

## SUMMARY OF THE ACTION

1.      This is a securities fraud class action against Ariba, Inc. ("Ariba" or the "Company") and its senior management, on behalf of all persons who purchased the common stock of Ariba between May 29, 2003 and February 7, 2005 inclusive (the "Class Period").

2.      Ariba provides "spend management" software that enables companies to manage the purchasing of non-payroll goods and services required to run their businesses. Ariba offers its customers software applications, professional services, and network access. Its software streamlines business processes related to the identification of suppliers of goods and services, the negotiation of the terms of purchases, and the management of ongoing purchasing activities.

3.      Prior to and throughout the Class Period, certain of Ariba's products were being offered, marketed and sold by Ariba although – unbeknownst to the investing public -- Ariba marketed those products in willful violation of patents held by another company.  Those Ariba products accounted for a material percentage of Ariba's business, revenues, and earnings.

4.      On February 8, 2005, Ariba disclosed that certain of its products had been found by a jury to have been developed in **willful** violation of patents held by another company.  In response to this news, Ariba's common stock declined 17.5% in a single day on February 8, 2005, causing injury to plaintiffs and the Class.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder by the SEC.

6.      Venue is proper in this District pursuant to §27 of the Exchange Act. Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

7.      In connection with the acts, conduct and other wrongs complained of, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of the national securities markets.

1

**THE PARTIES**

2    8.    Plaintiff Jonathan Crowell purchased Ariba common stock during the Class Period

3    as detailed in the certification previously filed with the Court, and was damaged thereby.

4    9.    Plaintiff Benjamin Lapin purchased Ariba common stock during the Class Period as

5    detailed in the certification previously filed with the Court, and was damaged thereby.

6    10.    Plaintiff Reuven Lapin purchased Ariba common stock during the Class Period as

7    detailed in the certification previously filed with the Court, and was damaged thereby.

8    11.    Defendant Ariba is a corporation organized and existing under the laws of the State

9    of Delaware, and maintains its principal place of business at 807 11th Avenue, Sunnyvale, California

10   94089.  Ariba makes, uses, sells and offers for sale in the United States certain electronic sourcing

11   and procurement software applications, services, systems and methods, including those referred to

12   as "Enterprise Spend Management" applications.

13   12.    Defendant David H. McCormick was, at all times relevant hereto, President of Ariba

14   and a member of Ariba's Board of Directors.  Because of his positions, he knew the adverse non-

15   public information about the business of Ariba, as well as its finances, markets and present and

16   future business prospects via access to internal corporate documents, conversations and connections

17   with other corporate officers and employees, attendance at management and Board of Directors'

18   meetings and committees thereof and via reports and other information provided to him in

19   connection therewith.  During the Class Period, McCormick participated in the issuance of false

20   and/or misleading statements, including the preparation of the false and/or misleading press releases

21   detailed in ¶¶ 19-53.  During the Class Period, McCormick sold approximately 169,000 shares of

22   Ariba stock at artificially-inflated prices for proceeds of approximately $2.5 million.

23   13.    Defendant Robert M. Calderoni was, at all times relevant hereto, Chairman and Chief

24   Executive Officer of Ariba.  Because of his positions, he knew the adverse non-public information

25   about the business of Ariba, as well as its finances, markets and present and future business

26   prospects via access to internal corporate documents, conversations and connections with other

27   corporate officers and employees, attendance at management and Board of Directors' meetings and

28

committees thereof and via reports and other information provided to him in connection therewith. During the Class Period, McCormick participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases detailed in ¶¶ 19-53.

14.    By reason of their positions, the officers and directors identified above in ¶¶ 12-13 (collectively the "Individual Defendants") had access to material inside information about Ariba and were able to control directly or indirectly the acts of Ariba and the contents of the representations disseminated during the Class Period by or in the name of Ariba.

15.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company were able to and did control the contents of the various quarterly and annual financial reports, SEC filings, press releases, and presentations to securities analysts pertaining to Ariba. Each Individual Defendant was provided with copies of Ariba's press releases and SEC filings alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their board membership and/or executive and managerial positions with Ariba, each Individual Defendant had access to the adverse non-public information about Ariba's business, finances, products, markets and present and future business prospects particularized herein, via access to internal corporate documents, conversations or connections with corporate officers and employees, attendance at Ariba's management and/or Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith. The Individual Defendants are liable for the false statements pleaded herein at ¶¶ 19-53, as those statements were each "group published" information, the result of the collective action of the Individual Defendants.

16.    Each of the defendants either knew or deliberately disregarded the fact that the illegal acts and practices and misleading statements and omissions described herein would adversely affect the integrity of the market for Ariba stock and would artificially inflate or maintain the price of that stock. Each of the defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiffs and members of the Class plaintiffs seek to represent.

## THE MARKET FOR ARIBA SECURITIES WAS EFFICIENT

17.     At all relevant times, the market for Ariba common stock was efficient.  Ariba had tens of millions of shares outstanding, and its shares traded on NASDAQ.  Ariba trades an average of more than half a million shares per day.  Among the indicia of the efficient market in which Ariba traded were Ariba's ability to file periodic public reports with the SEC, that numerous securities analysts followed the stock such as Piper Jaffray, JMP Securities, RBC Capital Markets, and CIBC World Markets, and that the market instantly absorbed information about Ariba.  Because Ariba's stock traded in an efficient market, Plaintiffs are entitled to avail themselves of the fraud-on-the-market theory including the presumption of reliance.

## MATERIALLY MISLEADING CLASS PERIOD STATEMENTS

18.     Throughout the Class Period, Ariba repeatedly issued public announcements and disclosures describing its products (as set forth below in ¶¶ 19-53).  Those statements were materially misleading for failure to disclose that Ariba, in developing and marketing those products, willfully infringed on the patents of a competitor (as discussed in ¶¶ 56-71, below).

19.     On April 17, 2003, Ariba issued a press release publicizing a conference devoted to Ariba's spend management software.  The conference sessions were to include panel discussions, technical demonstrations, Ariba product presentations and customer testimonials from leading companies and industry analysts, among others, such as American Express, AT&T, ChevronTexaco, IBM, Credit Suisse, JP Morgan Chase, and Merrill Lynch & Co.  Further, the conference sessions were "designed to provide attendees with practical information on how they can achieve substantial cost savings and improved spend management efficiencies though [sic] Enterprise Spend Management" as well as "help attendees learn about the key components of the Ariba Spend Management solutions."  The April 17, 2003 press release was materially misleading because while publicizing the benefits of its spend management software, Ariba did not disclose that it was wilfully infringing on a competitor's patents.

20.     On April 28, 2003, Ariba issued two press releases announcing the gain of a new large customer for Ariba's spend management software, its financial results for the second quarter of fiscal 2003, and a new product in its portfolio of spend management software products.  The first

1  press release announced that Limited Brands, Inc. had selected Ariba Spend Management including

2  the software Ariba Buyer among others - Ariba Buyer being one of the products that a jury found to

3  have infringed on ePlus' patents - to "better manage its corporate-wide spend, as well as the

4  complete purchasing process." The second press release disclosed, *inter alia*, second quarter

5  revenues of $59.3 million representing a 3 percent increase from the same period during fiscal 2002,

6  and software license revenues of $27.7 million representing an increase of 10 percent from the same

7  quarter the prior year. Both of Ariba's April 28, 2003 press releases, which were also included in

8  the Company's Form 8-K filed with the SEC on April 28, 2003, were materially misleading because

9  neither press release disclosed that Ariba was wilfully infringing on a competitor's patents

10  particularly with respect to Ariba Buyer.

11      21.     On April 29, 2003, Ariba issued a press release announcing the benefits obtained by

12  one large Ariba customer from using Ariba spend management software. The press release quoted

13  Neil Lustig, an Ariba employee, stating that "[o]ur solution offers a unique combination of software

14  and services that allow companies to accurately monitor and analyse [sic] costs through a closed loop

15  Spend Management process." The April 29, 2003 press release was materially misleading because

16  Ariba did not disclose that it was wilfully infringing on a competitor's patents.

17      22.     On May 3, 2003, Ariba issued a press release announcing deepened ties with a large

18  customer for Ariba's spend management software and proclaiming some of the benefits of such

19  software. The press release stated, *inter alia*, that Best Buy had expanded its commitment to Ariba

20  Spend Management, which supports Best Buy's "Book It, Buy It, Expense It" or "B2E" program.

21  The press release stated that the "B2E program enables Best Buy to increase its efficiency by

22  managing purchases for its headquarters, its retail stores, and distribution and service centers with

23  *Ariba® Buyer™ and to track and reimburse expenses with Ariba® Travel & Expense™.*"

24  (Emphasis added). Further, "Best Buy has upgraded to the latest version of Ariba Buyer" - Ariba

25  Buyer being one of the products a jury found that infringed on a competitor's patents - and added

26  other software products including Ariba Contracts and Ariba Invoice. The May 3, 2003 press release

27  was materially misleading because Ariba did not disclose that it was wilfully infringing on a

28  competitor's patents.

---

23.     On May 13, 2003, Ariba issued two press releases announcing the benefits of using Ariba's spend management software and new capabilities and upgrades concerning such software. One of the press releases announced "major upgrades" to the Ariba Spend Management solution set. The enhanced spend management solution set includes specialized features addressing "critical areas that pose[d] special challenges for managing services spend" such as non-PO procurement, supplier collaboration, complex bundled pricing, service level and milestone-based agreements, and rich services spend data. Both of Ariba's May 13, 2003 press releases were materially misleading because neither disclosed that Ariba was wilfully infringing on a competitor's patents.

24.     On June 10, 2003, Ariba issued a press release announcing a workshop for Ariba's spend management software, and proclaiming the benefits of such software. The press release stated, *inter alia*, that the interactive workshops will teach enterprise spend management strategies as well as educate students about the different functions and capabilities in the spend management solutions. The June 10, 2003 press release was materially misleading because Ariba did not disclose that it was wilfully infringing on a competitor's patents.

25.     On June 16, 2003, Ariba issued a press release publicizing selected customer and industry analyst presentations about Ariba's spend management software available through its own online resource website. The press release stated, *inter alia*, that the presentations covered various topics including services spend management, strategic sourcing, category-specific spend management and outsourcing professional services, and were accessible through Ariba's online resource website. The June 16, 2003 press release was materially misleading because Ariba did not disclose that it was wilfully infringing on a competitor's patents.

26.     On June 20, 2003, Ariba issued a press release announcing additional purchases by a large customer for Ariba's spend management software, and proclaiming some of the benefits of such software. Specifically, the press release stated, *inter alia*, that ChevronTexaco expanded its purchase of the Ariba Spend Management solutions by adding six new software products to its existing Ariba Buyer procurement solution - Ariba Buyer being one of the products a jury found to have infringed on a competitor's patents. Ariba further stated that benefits of the spend management solutions including allowing ChevronTexaco to "reduce payment cycle times, improve cash flow to

1  suppliers and allow [it] to benefit from early payment discounts." The June 20, 2003 press release

2  was materially misleading because Ariba did not disclose that it was wilfully infringing on a

3  competitor's patents.

4       27.    On July 15, 2003, Ariba issued a press release announcing a new product in its

5  portfolio of spend management software products. The press release stated, *inter alia*, that the Ariba

6  Supplier Performance Management (SPM) module was added to the Ariba Spend Management

7  solution, which was designed to assist customers obtain their enterprise spend management

8  objectives through "performance measurement, collaboration and improved supplier relationships."

9  The press release also proclaimed the features and benefits of the Ariba SPM module. The July 15,

10  2003 press release was materially misleading because in discussing its spend management software

11  products, Ariba did not disclose that it was wilfully infringing on a competitor's patents.

12       28.    On July 22, 2003, Ariba issued a press release announcing, *inter alia*, its financial

13  results for the third quarter of fiscal 2003, and the gain of new, large customers for Ariba's spend

14  management software. Ariba disclosed, *inter alia*, that third quarter revenues were $56.6 million

15  representing a 4 percent decrease from the same quarter the prior year, and software license revenues

16  of $21.3 million representing a 21 percent decrease from the corresponding fiscal 2002 quarter.

17  Ariba also announced new customers, namely Goodyear Tire & Rubber Company and AXA e-

18  Services, both of whom purchased Ariba Buyer, which was one of the products that a jury found to

19  have infringed on a competitor's patents. The July 22, 2003 press release, which was also included

20  in the Company's Form 8-K filed with the SEC on July 22, 2003, was materially misleading because

21  Ariba did not disclose that it was wilfully infringing on a competitor's patents.

22       29.    On July 23, 2003, Ariba issued a press release announcing the gain of a new large

23  customer for Ariba's spend management software and proclaiming the benefits of such software.

24  Specifically, the press release stated, *inter alia*, that San Miguel Corporation, a food, beverage and

25  packaging company in Asia, selected the full Spend Management solution set, which includes Ariba

26  Buyer, to "automate, streamline and manage its purchasing processes company-wide." Benefits of

27  the software include allowing the user to "aggregate purchasing power..., channel spend to preferred

28  suppliers, negotiate better contracts and ensure compliance against those contracts." The July 23,

1  2003 press release was materially misleading because Ariba did not disclose that it was wilfully

2  infringing on a competitor's patents.

3       30.   On August 7, 2003, Ariba issued a press release announcing that the Government of

4  the District of Columbia had completed the first deployment phase of Ariba's spend management

5  software and proclaiming the benefits of such software. The press release stated, *inter alia*, that the

6  deployment of the Ariba Buyer solution - Ariba Buyer being one of the products a jury found to have

7  infringed on a competitor's patent - and Ariba eForms was known internally as the Procurement

8  Automated Support System or PASS and was implemented "to better manage the purchase of

9  contract and consulting services, IT equipment and office supplies, and plans to later extend the

10  solution to include wider categories of spend." The August 7, 2003 press release was materially

11  misleading because in publicizing its products, particularly the Ariba Buyer software, Ariba did not

12  disclose that it was wilfully infringing on a competitor's patents.

13       31.   On August 27, 2003, Ariba issued a press release publicizing a conference devoted

14  to Ariba's spend management software. The press release stated, *inter alia*, that the conference

15  would feature Ariba customers and executives discussing spend management experiences, spend

16  analysis, effective strategies, and strategic sourcing and procurement solutions. Ariba customers

17  scheduled to present at the conference included Air Products and Chemicals Corporation, and the

18  District of Columbia. The August 27, 2003 press release was materially misleading because in

19  publicizing the conference, presenters and topics to be discussed, Ariba omitted any mention of its

20  patent violations concerning such software.

21       32.   On October 22, 2003, Ariba issued a press release announcing its financial results for

22  the fourth quarter and fiscal year of 2003 (ended September 30, 2003), as well as the gain of new

23  customers for Ariba's spend management software and deepened ties with existing customers.

24  Defendants disclosed, *inter alia*, that fourth quarter revenues were $59.1 million with software

25  license revenues of $23.6 million representing a 2 percent increase from software license revenues

26  of $23.2 million during the same quarter of fiscal 2002. Further, fiscal year revenues were $236.7

27  million with software license revenues of $103.1 million representing a 5 percent increase from

28  software license revenues of $98.4 million for fiscal year 2002. Ariba also announced new

1  customers for Ariba's spend management software such as Cummins Inc., Pittsburgh Plate and

2  Glass, among others, as well as United KFPW and Educate, Inc., who selected Ariba Buyer, which

3  was one of the products that a jury later found to have wilfully infringed on a competitor's patents.

4  Ariba further disclosed that existing customers who "added solutions to complement their existing

5  Ariba Buyer platform" included Amtrak, Sony Music, and British Airways.  The October 22, 2003

6  press release, which was also included in the Company's Form 8-K filed with the SEC on October

7  22, 2003, was materially misleading because defendants omitted any mention of Ariba's patent

8  violations concerning such software particularly the Ariba Buyer software, and which tainted the

9  reported financial results.

10       33.     On December 2, 2003, Ariba issued a press release announcing, *inter alia*, that its

11  spend management software has "helped DuPont [ ], one of the world's leading science companies,

12  transform its purchasing process, and save up to 13% on many categories of spend."  Moreover,

13  DuPont used Ariba Buyer - which was one of the products a jury found to have infringed on a

14  competitor's patents - "to track and manage savings projects."  Defendants stated that Ariba's

15  software and services and "increased sourcing efficiencies have saved DuPont money and reduced

16  sourcing cycle times from months to weeks."  The December 2, 2003 press release was materially

17  misleading because while touting the benefits of its software and services including Ariba Buyer,

18  Ariba did not disclose that it was wilfully infringing on a competitor's patents.

19       34.     On December 8, 2003, Ariba issued a press release proclaiming some of the benefits

20  of Ariba's spend m anagement s oftware.  T he D ecember 8 , 2 003 p ress r elease w as m aterially

21  misleading because Ariba did not disclose that it was wilfully infringing on a competitor's patents

22  with respect to Ariba Buyer.

23       35.     On December 17, 2003, Ariba issued a press release discussing, *inter alia*, some of

24  the benefits of Ariba's spend management software.  The December 17, 2003 press release was

25  materially misleading because Ariba did not disclose that it was wilfully infringing on a competitor's

26  patents with respect to Ariba Buyer.

27       36.     On January 23, 2004, Ariba issued a press release announcing a definitive agreement

28  to acquire FreeMarkets, Inc., a leading provider of Global Supply Management solutions.  The

January 23, 2004 press release stated, *inter alia*:

> Ariba and FreeMarkets Announce Strategic Merger Agreement
>
> Combined Company to Offer Broadest Solutions in Enterprise Spend Management
>
> SUNNYVALE, Calif. and PITTSBURGH, Penn. – January 23, 2004 - Ariba, Inc. (Nasdaq: ARBA), a leading Enterprise Spend Management (ESM) solutions provider, today announced a definitive agreement to acquire FreeMarkets, Inc. (Nasdaq: FMKT), a leading provider of Global Supply Management solutions. The merger of Ariba and FreeMarkets will combine their complementary strengths to help global customers generate even greater savings through a more robust set of Enterprise Spend Management solutions.
>
> Under the terms of the definitive agreement, stockholders of FreeMarkets will receive 2.25 Ariba common shares and $2.00 in cash for each outstanding FreeMarkets common share. Based on the closing price of Ariba common stock on January 22, 2004, the transaction is valued at approximately $493 million.
>
> The combined company would have had approximately $360 million in annualized revenue and fees as of December 31, 2003. Ariba's broad suite of enterprise spend management software and services will complement FreeMarkets services-based sourcing and global supply management expertise. Ariba customers will benefit from richer sourcing services and supply management knowledge while FreeMarkets customers will benefit from a broader portfolio of solutions, both in sourcing and across the ESM spectrum.
>
> "It's no secret that many of the world's leading companies have already turned to Ariba and FreeMarkets to save money," said Bob Calderoni, president and CEO, Ariba. "This deal brings together two leading companies focused on providing customers with innovative ways to impact their bottom lines. I am excited by what this means for our customers, our stockholders, and our employees. The complementary strengths of Ariba and FreeMarkets will help accelerate this market and set the standard for spend management solutions for years to come."
>
> The integrated company will retain the Ariba name and combine the leadership teams of both companies. Upon completion of the acquisition, the company will be led by Calderoni, who will retain his roles as CEO and Chairman of the Board....
>
> ***
>
> Separately, Ariba will seek stockholder approval to consummate a 1-for-5 or 1-for-6 reverse stock split, which if consummated would take place at the time of completion of the merger.

The January 23, 2004 press release, which was also included in the Company's Form 8-K filed with the SEC on January 23, 2004, was materially misleading because Ariba did not disclose that it was wilfully infringing on a competitor's patents.

37.     On January 28, 2004, Ariba issued a press release announcing, *inter alia*, its financial results for the first quarter of fiscal 2004, its agreement to merge with FreeMarkets, and the gain of

1   new, large customers for Ariba's spend management software. In particular, defendants disclosed

2   that first quarter revenues were $52.7 million compared to $61.7 million during the same quarter of

3   fiscal 2003 and first quarter software license revenues were $18.7 million compared to $30.4 million

4   during the same quarter of fiscal 2003. Also, new customers such as H.J. Heinz Company, Owens

5   Corning, Michelin Group, among others, "purchased multiple components of Ariba's Spend

6   Management solutions" including Ariba Buyer, which was one of the products a jury found that

7   infringed on a competitor's patents. The January 28, 2004 press release, which was also included

8   in the Company's Form 8-K filed with the SEC on January 28, 2004, was materially misleading

9   because Ariba omitted any mention of defendants' willful patent violations concerning such software

10   or that the reported results were accomplished with the benefit of this intentional misconduct.

11   38.   On February 2, 2004, Ariba filed a Form 8-K with the SEC which repeated the merger

12   agreement between Ariba and FreeMarkets that was previously announced in the January 23, 2004

13   press release. A copy of the January 23, 2004 press release, among other things, was incorporated

14   by reference in its entirety with the Form 8-K. The February 2, 2004 Form 8-K filing was materially

15   misleading because Ariba did not disclose that it was wilfully infringing on a competitor's patents.

16   39.   On February 4, 2004, Ariba issued a press release announcing the gain of a new

17   customer for Ariba's spend management software and proclaiming the benefits of such software.

18   Ariba stated:

19   *Based on results of a comprehensive analysis of Ariba and competing solutions,*
    Owens Corning selected Ariba because of the company's deep understating [sic] of

20   enterprise sourcing operations, strong process and project management capabilities
    for strategic planning and stakeholder involvement, and the ease of use that drives

21   broad organizational adoption. (Emphasis added).

22   The February 4, 2004 press release was materially misleading because Ariba did not disclose

23   that it was wilfully infringing on a competitor's patents.

24   40.   On February 18, 2004, Ariba issued a press release announcing three new products

25   to its Enterprise Spend Management suit - namely, Ariba Category Procurement, Ariba Contract

26   Workbench, and Ariba Settlement - to increase customer savings, and upgrades in its portfolio of

27   spend management software products. In describing Ariba Category Procurement, which was one

28   of the products that a jury found to have infringed on a competitor's patents, Ariba touted:

Ariba Category Procurement is a new solution for managing complex spend categories at the front lines of the business. The solution is designed to enable companies to double, or in some cases triple the amount of spend they currently capture and manage, resulting in increased savings to the bottom-line. Ariba Category Procurement uses new capabilities in collaborative requisitioning, rate card and formula-based contract pricing, and time card management to manage a wide variety of complex spend categories.

Ariba also announced upgrades to a number of its software applications such as Ariba Buyer, Ariba Enterprise Sourcing, and Ariba Category Management, among others. With respect to Ariba Buyer, which was another product that a jury found to have infringed on the same competitor's patents, upgrades consisted of "reporting enhancements in Ariba Buyer." The February 18, 2004 press release was materially misleading because Ariba did not disclose that it was wilfully infringing on a competitor's patents with respect to two of its products - Ariba Category Procurement and Ariba Buyer.

41.     On March 11, 2004, Ariba issued a press release publicizing a conference devoted to Ariba's spend management software. The press release stated, *inter alia*, that the conference will be held in Phoenix, Arizona and will feature keynote presenters from American Express Company, ExxonMobil, British Airways, and Gartner Research in addition to Ariba executives about the benefits of Ariba's Enterprise Spend Management software. Further, Michael Schmitt, Ariba's chief marketing officer and EVP of strategy, stated that its conferences "have evolved into an important source of information that help companies achieve the kind of spend control and savings that contribute directly to their bottom line." The March 11, 2004 press release was materially misleading because in publicizing the benefits of its spend management software, Ariba did not disclose that it was wilfully infringing on a competitor's patents.

42.     On April 27, 2004, Ariba issued a press release announcing, *inter alia*, its financial results for the second quarter of fiscal 2004, the addition of three new spend management software, and the gain of new, large customers for Ariba's spend management software. Defendants disclosed that second quarter revenues were $56.0 million compared to $59.3 million during the same quarter of fiscal 2003, and software license revenues were $15.9 million compared to $27.7 million for the same period the prior year. Moreover, Bob Calderoni, Ariba's president and CEO, stated:

> *"This was an important quarter for Ariba...We continued to build capabilities that*

*will reinforce our position as the market leader for Enterprise Spend Management solutions. The acquisitions of Alliente and Softface, coupled with our announcement of three new products, provide us with the broadest technology platform in the market,* while we expect our pending merger with FreeMarkets to provide us with the deepest services expertise in the market." (Emphasis added).

Ariba also announced three new spend management products: Ariba Contract Workbench, Ariba Category Procurement, and Ariba Settlement. In describing Ariba Category Procurement, which was one of the products in which a jury found that Ariba wilfully infringed upon a competitor's patents, defendants announced:

> Ariba Category Procurement enables companies to manage the requisition-to-pay lifecycle for complex spend categories – such as temporary labor, consulting, print, and marketing – that require highly interactive buying processes, variable pricing, and time card and service receipt management. By facilitating these processes, the tool enhances contract compliance, allows for greater spend visibility, and accelerates cycle times.

*****

> Ariba Spend Management solutions also include Ariba Buyer™, Ariba Analysis™, Ariba Contracts™, Ariba Invoice™, Ariba Category Management™, Ariba Enterprise Sourcing™ and Ariba Supplier Performance Management™.

The April 27, 2004 press release, which was also included in the Company's Form 8-K filed with the SEC on April 27, 2004, was materially misleading because Ariba did not disclose that it was wilfully infringing on a competitor's patents with respect to two of its software products, namely Ariba Category Procurement and Ariba Buyer, and that its reported results were obtained through sales of the illegal software.

43.    On May 3, 2004, Ariba issued a press release announcing the commencement of its annual conference concerning spend management software. The conference will be held in Phoenix, Arizona and will feature keynote presenters from American Express Company, ExxonMobil, British Airways, and Gartner Research in which attendees "will interact with leading companies to learn how Enterprise Spend Management is moving to the front lines of business and becoming a hallmark of today's most productive, cost-efficient organizations." Attendees will also learn strategies and techniques related to enterprise spend management, and gain "best-practice tips" from Ariba customers including The Home Depot, Merrill Lynch, Saks, Inc., and Visa International. The May 3, 2004 press release was materially misleading because in publicizing the benefits of its spend

1  management software, Ariba did not disclose that it was wilfully infringing on a competitor's

2  patents.

3      44.    On July 1, 2004, Ariba issued a press release announcing that it had completed its

4  merger with FreeMarkets and effected a six-for-one reverse stock split.  The July 1, 2004 press

5  release, which was also included in the Company's Form 8-K filed with the SEC on July 15, 2004,

6  was m aterially m isleading b ecause A riba d id n ot d isclose t hat i t w as w ilfully  infringing o n a

7  competitor's patents and that a patent infringement suit had been filed against the Company on May

8  26, 2004.

9      45.    On July 21, 2004, Ariba issued a press release announcing, *inter alia*, its financial

10 results for the third quarter of fiscal 2004, and the gain of new and existing customers deepening its

11 relationship with Ariba and its spend management software.  Specifically, defendants disclosed third

12 quarter revenues of $53.0 million compared to $56.6 million during the same quarter of fiscal 2003,

13 and software licensing revenues of $15.5 million compared to $21.3 million from the same quarter

14 the prior year.  Moreover, Bob Calderoni, Ariba's CEO and chairman of the board, and Dave

15 McCormick, Ariba's president, stated the following, respectively:

16      "This was a solid quarter for Ariba...We completed the merger with FreeMarkets, and
        we have made tremendous progress on executing our integration plans. At the same
17      time, we have continued to gain traction with significant customer wins in several
        blue chip accounts, and we are already off to a strong start with our combined
18      customer efforts."

19      *****

20      "Ariba is now very well positioned to help companies address the most critical
        procurement challenges," said Dave McCormick, president, Ariba. "Our customers
21      are looking for more than just short-term tactical projects, and they are turning to
        Ariba for the software and services solutions they need to accelerate their bottom line
22      results."

23      The July 21, 2004 press release, which was also included in the Company's Form 8-K filed

24 with the SEC on July 21, 2004, was materially misleading because Ariba did not disclose that it was

25 wilfully infringing on a competitor's patents and that a patent infringement action had been filed

26 against the Company on May 26, 2004.

27      46.    On August 18, 2004, Ariba issued a press release announcing the benefits obtained

28 by one large Ariba customer from using Ariba spend management software. The press release stated,

1   *inter alia*, that upon implementing five strategic sourcing events using Ariba's Spend Management

2   software, O2, a leading provider of mobile services in Europe, had achieved savings of more than

3   $8 million.  The August 18, 2004 press release was materially misleading because while publicizing

4   the benefits of its spend management software, Ariba did not disclose that it was wilfully infringing

5   on a competitor's patents and that a patent infringement action had been filed against the Company

6   on May 26, 2004.

7        47.   On October 13, 2004, Ariba issued a press release announcing that, of nine companies

8   recently identified for excellence in "e-sourcing", five were Ariba customers.  Moreover, Dave

9   McCormick, president of Ariba, stated that "'[t]hese accolades...are further evidence that our

10   customers are using the latest technology to successfully manage spend and reap savings across their

11   enterprise.'"  The October 13, 2004 press release was materially misleading because in publicizing

12   that five of its customers were recognized for e-sourcing excellence, Ariba did not disclose that some

13   of its spend management software was wilfully infringing on a competitor's patents and that a patent

14   infringement action had been filed against the Company on May 26, 2004.

15        48.   On October 27, 2004, Ariba issued a press release announcing its financial results for

16   the fourth quarter and fiscal year of 2004 (ended September 30, 2004), as well as gain of new, large

17   customers for Ariba's spend management software such as Ameritrade, Caterpillar, Continental

18   Airlines, and Sprint.  Defendants disclosed, *inter alia*, that fourth quarter total revenues were $84.1

19   million c ompared t o $ 59.1 m illion d uring t he s ame q uarter o f f iscal 2 003, a nd f ourth q uarter

20   software license revenues were $15.6 million compared to $23.6 million for the same period the

21   prior year.  Fiscal year 2004 revenues were $245.8 million compared to $236.7 million for fiscal year

22   2003, and software license revenues were $65.7 million compared to $103.1 million for the prior

23   year.  Moreover, Bob Calderoni, Ariba's CEO, stated:

24        "I am pleased with our results during the fourth quarter...*We are leading the market
at a time when demand for Spend Management solutions continues to grow.* Our
25        team is delivering globally to help accelerate bottom line results for our customers,
and we are executing well against our integration plans following our recent merger
26        activities." (Emphasis added).

27        The October 27, 2004 press release, which was also included in the Company's Form 8-K

28   filed with the SEC on October 27, 2004, was materially misleading because Ariba did not disclose

1  that it was wilfully infringing on a competitor's patents and that a patent infringement action had

2  been filed against the Company on May 26, 2004.

3       49.    On November 23, 2004, Ariba issued a press release announcing that two Ariba

4  customers - Limited Brands and PPG Industries - had been cited for their "best practices" concerning

5  spend management. Dave McCormick, Ariba's president, explained that Ariba in working closely

6  with Limited Brands and PPG Industries, Ariba "help[ed] each increase their spend visibility and put

7  spending controls in place" in order to "drive significant cost savings enterprise-wide." The

8  November 23, 2004 press release was materially misleading because Ariba did not disclose that it

9  was wilfully infringing on a competitor's patents and that a patent infringement action had been filed

10  against the Company on May 26, 2004.

11       50.    On December 7, 2004, Ariba issued a press release announcing a new customer for

12  Ariba's spend management software and proclaiming some of the benefits of such software. The

13  press release stated, *inter alia*, that Caterpillar Inc., a leading manufacturer of construction and

14  mining equipment, clean diesel and natural gas engines and industrial gas turbines, selected Ariba's

15  spend management software including Ariba Buyer among others, to help manage its global

16  procurement cycle. In addition, "Ariba designed and developed a customized global indirect

17  purchasing system that will manage Caterpillar's full spending lifecycle - from planning to

18  payment...." Ariba explained that the benefits of its spend management software include reduced

19  processing time and costs, contract efficiency and better control and visibility in the procurement

20  lifecycle. The December 7, 2004 press release was materially misleading because Ariba did not

21  disclose that it was wilfully infringing on a competitor's patents particularly with respect to Ariba

22  Buyer and that a patent infringement action had been filed against the Company on May 26, 2004.

23       51.    On December 17, 2004, Ariba issued a press release announcing deepened ties with

24  a large customer for Ariba's spend management software and proclaiming some of the benefits of

25  such software. The press release stated, *inter alia*, that Air Products and Chemicals, Inc., will

26  "globally deploy Ariba® Invoice™ and expand deployment of Ariba Buyer and Ariba Sourcing

27  solutions to streamline sourcing processes and improve the company's corporate-wide spend

28  management." The release further indicated that Air Products and Chemicals will use Ariba Buyer,

1  which was one of the products a jury found to have infringed on a competitor's patents, "to reduce

2  expenses by ensuring that buyers purchase from negotiated contracts...." Finally, Dave McCormick,

3  Ariba's president, explained reasons why Air Products and Chemicals chose to deepen its ties with

4  Ariba by stating:

5    *"Our difference is that we are focused on spend management.* We
     help companies solve the primary obstacles to achieving cost savings

6    and building out a closed-loop process. Companies benefit not only
     from our technology, but also from our deep analysis of marketplace

7    trends and conditions. *This is precisely what makes Ariba so different
     from other providers.*" (Emphasis added).

8

9    The December 17, 2004 press release was materially misleading because Ariba did not

10  disclose that it was wilfully infringing on a competitor's patents and that a patent infringement action

11  had been filed against the Company on May 26, 2004.

12    52.    On January 7, 2005, Ariba issued a press release announcing, *inter alia*, that it had

13  been identified in a recent report as one of seven e-procurement leaders based on its product

14  offerings.   In response to this report, Michael Schmitt, Ariba's executive vice president and chief

15  marketing officer, stated:

16    *"Ariba is part of an extremely competitive marketplace, so this ranking is a testament
     to our success in creating the most effective solutions and services for spend*

17    *management...We see a lot of room for growth and innovation in this space,
     particularly when tied to our leadership in other aspects of spend management,* such

18    as sourcing and analysis. Our commitment is to support the broader role of this
     category rather than to focus on any one facet." (Emphasis added).

19

20    The report further praised Ariba for having "set the bar for features and functions" in

21  connection with the eProcurement solutions.  The January 7, 2005 press release was materially

22  misleading because in publicizing its award of being a "leader" in spend management, Ariba did not

23  disclose that it was wilfully infringing on a competitor's patents and that a patent infringement action

24  had been filed against the Company on May 26, 2004.

25    53.    On January 31, 2005, Ariba issued a press release announcing its financial results for

26  the first quarter of fiscal 2005 (ending September 30, 2005), as well as gain of new, large customers

27  for Ariba's spend management software. Defendants disclosed, *inter alia*, that first quarter revenues

28  for fiscal 2005 were $86.9 million compared to $52.7 million for the same period during fiscal 2004,

1  and software license revenues were $17.1 million compared to $18.7 million for the same period the

2  prior year.  Ariba also disclosed the addition of 19 new customers during the quarter and renewed

3  or expanded agreements with many of its existing customers including Merck, Shell Oil, and Conoco

4  Phillips.  The January 31, 2005 press release, which was included in the Company's Form 8-K filed

5  with the SEC on January 31, 2005, was materially misleading because Ariba did not disclose that

6  it was wilfully infringing on a competitor's patents and that a patent infringement action had been

7  filed against the Company on May 26, 2004.

8       54.    The statements identified above in ¶¶ 19-53 were materially false and misleading

9  because, in discussing Ariba's spend management software, the benefits obtained by customers using

10  such software, the leadership position of Ariba in the marketplace for such software, and the

11  revenues gained by Ariba from sales of such software, defendants omitted any mention of Ariba's

12  patent violations concerning such software and/or of the costs of liability for such patent violations.

13       55.    Following the conclusion of the class period, Ariba's shares declined materially.

14               **ePLUS' PATENT INFRINGEMENT ACTION AGAINST ARIBA**

15       56.    In 2000 and 2001, ePlus, Inc. of Herndon, Virginia, obtained three patents concerning

16  its software procurement system, which allowed companies' buyers to search electronic catalogues

17  online when searching for goods, to comparison-shop to find the best vendor and best price, and to

18  determine product availability.  Subsequently, Ariba developed procurement software products -

19  Ariba Buyer, Ariba Marketplace, and Ariba Category Procurement - that infringed upon ePlus'

20  patents.

21       57.    On May 26, 2004, ePlus, Inc. filed a patent infringement action (the "Patent Action")

22  against Ariba in the United States District Court for the Eastern District of Virginia, (No.

23  1:04cv612), alleging that at least three Ariba products - Ariba Buyer, Ariba Marketplace and Ariba

24  Category Procurement - infringed three U.S. patents owned by ePlus.  The Patent Action claims

25  royalty damages of $76-$98 million as well as Ariba's discontinuance of further sales of these

26  products. ePlus contended that Ariba infringed on all 79 claims in its three patents.  To streamline

27  the trial, the presiding judge, U.S. District Judge Leonie M. Brinkema, asked ePlus to bring just eight

28  claims to the jury's attention.  The trial was bifurcated with the liability phase of the trial beginning

1    on January 24, 2005 and lasted only two weeks.

2        58.    The Patent Action was nowhere disclosed by Ariba in any of its public statements

3    (such as its July 21, 2004 earnings announcement for the quarter ended June 30, 2004, and its

4    October 27, 2004 earnings announcement for the quarter and the fiscal year ended September 30,

5    2004)or its SEC filings (such as its August 13 Form 10-Q for the quarter ended June 30, 2004) until,

6    on December 14, 2004, Ariba filed its Form 10-K for its fiscal 2004 year (ended September 30,

7    2004) (the "2004 Form 10-K"). The continuing non-disclosure of the Patent Action in Ariba's

8    public statements and SEC filings until December 14, 2004 was a material omission that rendered

9    such public statements and SEC filings materially misleading.

10       59.    The 2004 Form 10-K (filed with the SEC on December 14, 2004) stated for the first

11   time, in relevant part:

12       Patent Infringement Litigation

13       On May 26, 2004, a patent infringement action was filed against us in the United
         States District Court for the Eastern District of Virginia by ePlus, Inc, alleging that
14       three of our products, Ariba Buyer, Ariba Marketplace and Ariba Category
         Procurement, infringe three U.S. patents owned by ePlus.
15
         Discovery in this case is complete and the trial has been scheduled for January 4,
16       2005. The Court has indicated that it will bifurcate the trial and try the validity and
         infringement issues to the jury before trying the damages- related issues. Both parties
17       had moved for summary judgment in their favor on the question of infringement.
         Additionally, we had moved for summary judgment that certain claims in the patents
18       in suit are invalid. On November 19, 2004, the Court denied all the summary
         judgment motions.
19
         We cannot predict the outcome of this litigation. If we were to lose, we could be
20       liable for damages for past infringement. Plaintiff claims royalty damages of
         approximately $76 million to $98 million. We dispute that we are liable for any
21       damages and dispute plaintiff's calculation as to the amount of damages. If we were
         to lose, we could be enjoined from selling the products at issue in the litigation and
22       enjoined from inducing customers to infringe. However, we believe we have strong
         defenses to ePlus's claims and intend to vigorously defend against them.
23
         60.    The disclosure in the 2004 Form 10-K was incomplete, misleading and omitted
24
     material information - namely, that Ariba had been willfully infringing upon ePlus' patents.
25
         61.    On February 8, 2005, Ariba revealed that following a nine day trial, a jury had found
26
     Ariba guilty of willful infringement of ePlus' patents, and that Ariba's potential liability for damages
27
     could be significantly higher than the amount disclosed in the 2004 Form 10-K. The February 8,
28

2005 press release stated:

> Verdicts Rendered in First Phase of Ariba Patent Infringement Trial
>
> SUNNYVALE, Calif., February 8, 2005 - Ariba, Inc. (Nasdaq: ARBA), the leading Spend Management solutions provider, today announced that it has been found liable by a jury in the United States District Court for the Eastern District of Virginia for infringing three U.S. patents held by ePlus, Inc., a company based in Herndon, Virginia. On February 7, 2005, the jury declined to invalidate the three patents at issue and found that Ariba infringed certain claims contained in the three patents. Ariba believes the findings of the jury are erroneous and intends to vigorously pursue an appeal of the verdicts. In the meantime, Ariba intends to quickly provide its customers with software updates designed to avoid the alleged infringement.
>
> ePlus filed the infringement action on May 26, 2004 claiming that certain features in three o f Ariba's p roducts, A riba B uyer, A riba M arketplace a nd A riba C ategory Procurement, infringed claims in the three patents, and the trial began on January 24, 2005. The trial judge bifurcated the trial into two phases, the first to determine the validity of the patents and whether Ariba's products infringed those patents and the second to try damages-related issues. Yesterday's findings were only as to the first phase of the trial, and Ariba expects that the damages-related phase will begin on February 9, 2005.
>
> ePlus claims royalty damages of $76.0 million to $98.0 million. Based on the jury's finding of willful infringement, the trial judge has the discretion to enhance any award up to three times the jury's award of damages. Ariba disputes that it is liable for any damages and disputes ePlus's calculation as to the amount of the damages. However, Ariba cannot predict the outcome of the damages phase of the trial, whether it will be successful on appeal, or whether it will be successful in obtaining a stay of any injunction against further infringement pending appeal.

62.    In response to the February 8, 2005 press release, which revealed Ariba's class period fraud, Ariba common stock fell 17.5%, closing on February 8, 2005 at $8.04 per share, down $1.71 per share from the previous day's closing price of $9.75 per share, thereby causing injury to investors who purchased Ariba shares at artificially inflated prices during the class period.

## DEFENDANTS ACTED WITH SCIENTER

**A.    The Evidence Obtained by ePlus, Inc. in the Patent Action was Sufficient to Convince the Jury that Ariba Intentionally Infringed on ePlus' Patents**

63.    As revealed in the Patent Action, ePlus obtained significant evidence during discovery to show - and ultimately convince the jury - that Ariba intentionally infringed on ePlus' patent rights.

64.    The first evidence demonstrating this occurred shortly after ePlus' May 29, 2003 press release announcing the issuance of U.S. Patent No. 6,505,172, one of the three patents in suit in the Patent Action.

65.     Ariba clearly knew about the ePlus patent. Evidence submitted at trial confirms that a week following ePlus' May 29, 2003 press release, Ariba's Manager of Sales Enablement, Don Darby, sent an e-mail to the Ariba sales force pertaining to the issuance of the ePlus patent. *See* Plaintiff ePlus, Inc.'s Brief in Opposition to Defendant Ariba, Inc.'s Motion *In Limine* to Preclude Evidence of Willfulness, at 3 (Dkt. No. 213). This evidence, *inter alia*, was presented to the jury to show that Ariba was on notice of ePlus' patent as of mid-2003 but Ariba made no attempt to avoid infringing ePlus' patent rights.

66.     Evidence obtained by ePlus in discovery also revealed that not one of any of Ariba witness testified that Ariba did anything to meet its duty of care to avoid infringing ePlus' known patent rights. *Id.* For example, upon becoming aware of ePlus' patents or the possibility of infringing on the patents, Ariba neither redesigned its accused products and methods nor produced a competent written opinion of counsel as to non-infringement, the invalidity of ePlus' patents, or its unenforceability. *Id.*

67.     ePlus obtained testimony from Ariba's own witnesses confirming that Ariba did not review ePlus' patents after receiving notice of the infringement suit. This clearly supports evidence of Ariba's willfulness. For instance, Ariba's Chief Technical Officer and its key sales officer charged with selling its infringing product, testified that they did not review the patents after learning of the lawsuit. *Id.* at 14. Moreover, Ariba's in-house attorney testified that he only looked at the first few pages of one of ePlus' patents after learning of the lawsuit but then put it aside because he did not find it to be "good reading." *Id.*

68.     ePlus discovered that Ariba did not have a patent clearance policy or procedure for reviewing its commercial products to determine if its product might be infringing on the patent rights of other companies. *Id.* While ePlus recognized that the lack of a patent clearance policy was not dispositive, it was an additional fact for the jury's consideration under the totality of circumstances for willfulness. Ultimately, the jury concluded that it was when it found by clear and convincing evidence that Ariba wilfully infringed on ePlus' patents. *See* Special Verdict Form (Dkt. No. 281).

69.     ePlus also offered testimony from an Ariba witness "that an Ariba employee, when drafting a competitor report about ePlus in September 2003, copied portions of an ePlus web page

1  or brochure which stated that ePlus' electronic sourcing technology was patented." *See* Plaintiff

2  ePlus, Inc.'s Brief in Support of Motion for Judgment as a Matter of Law, at 15, n. 7 (Dkt. No. 275).

3  Moreover, "[i]n response to the question, '[s]o, as of September 11, 2003, personnel within Ariba

4  were aware that ePlus had patents covering its supplier enablement technology correct?'" Ariba's

5  witness agreed. *Id.*

6  　　　　70.　　On October 6, 2004, ePlus proffered the expert report of Harry F. Manbeck, Jr., a

7  former Patent Trademark Office Commissioner, who determined, *inter alia*, that: 1) Ariba became

8  aware of the patents by June 2003; 2) Ariba continued to infringe after becoming aware of the

9  patents; 3) there was no evidence that Ariba performed any analysis of the patents after learning of

10  them to determine whether they were infringed, invalid, or unenforceable; and 4) there was no

11  evidence that Ariba redesigned its products to avoid infringement. *See* Plaintiff ePlus, Inc.'s Brief

12  in Opposition to Defendant Ariba, Inc.'s Motion for Mistrial, at 12 (Dkt. No. 285).

13  　　　　71.　　After a nine-day trial, which included expert testimony presented from both parties,

14  ePlus' submission of 33 Ariba-authored documents into evidence to show infringement compared

15  to no documents offered by Ariba in opposition, and admissions from Ariba executives both at trial

16  and from deposition testimony demonstrating the complete disregard of the ramifications of

17  infringing ePlus' patents, the jury found - after considering the totality of the circumstances - that

18  Ariba wilfully infringed on ePlus' patents. *See* Special Verdict Form (Dkt. No. 281).

**ADDITIONAL SCIENTER ALLEGATIONS**

20  **A.　　Defendant McCormick's and Other Corporate Officers' Stock Sales**

21  　　　　72.　　While Ariba's officers and directors were issuing misleading statements about Ariba's

22  business by virtue of failing to disclose that it was infringing on a competitor's patent rights,

23  Defendant McCormick and three corporate officers sold shares of Ariba which they owned for total

24  proceeds in excess of $2.8 million while in possession of material nonpublic information, and to

25  profit from the artificial inflation of Ariba's stock price created by Ariba's fraud.

26  　　　　73.　　Specifically, during the first two weeks of November 2004, Defendant McCormick

27  sold approximately 169,000 shares of Ariba stock, at prices between $14.29 and $15.13 per share,

28  for proceeds of approximately $2.5 million. The timing of Defendant McCormick's sale of Ariba

1    stock was suspicious because it occurred after ePlus filed its patent infringement suit against the

2    Company on May 26, 2004 but before Ariba disclosed the patent infringement suit in the Company's

3    2004 Form 10-K filed with the SEC on December 14, 2004.

4        74.    The timing of the three corporate officers' sales of their Ariba stock during the Class

5    Period was suspicious in that it occurred within months following ePlus' May 29, 2003 press release

6    announcing the issuance of U.S. Patent No. 6,505,172, one of the three patents in suit in the Patent

7    Action. Specifically, on or about June 3, 2003, Ariba vice president, John True, sold 60,000 shares

8    of Ariba stock at a price of $3.80 per share, for proceeds of approximately $228,000. Similarly, on

9    or about June 11, 2003, Ariba vice president, Kevin Costello, sold 24,131 shares or Ariba stock at

10   $3.72 per share, for proceeds of approximately $89,797. Last, on or about July 31, 2003, Ariba vice

11   president Michael Schmitt, sold 21,417 shares of Ariba stock at $2.73 per share, for proceeds of

12   approximately $58,468

13   **B.    Defendants' Issuance of Ariba Stock as Transaction Currency**

14       75.    Lastly, in addition to the personal benefits reaped by Defendant McCormick and

15   Ariba's officers, Ariba used its artificially inflated stock as currency to acquire FreeMarkets Inc.

16   during the Class Period. In particular, Ariba acquired FreeMarkets for approximately $547.4 million

17   consisting of, *inter alia*, nearly $89.6 million of cash and $364.4 million of artificially inflated Ariba

18   common stock (based on the issuance of approximately 16.8 million shares with a fair value of

19   $21.70 per share[1]). On July 1, 2004, Ariba completed its merger with FreeMarkets and effected a

20   six-for-one reverse stock split.

21                          **CLASS ACTION ALLEGATIONS**

22       76.    Plaintiffs bring this lawsuit pursuant to Rule 23(a) and (b)(3) of the Federal Rules

23   of Civil Procedure, on behalf of themselves and on behalf of a class of persons who purchased Ariba

24

25

26       [1]As reported in Ariba's Form 10-Q for the period ending June 30, 2004 at note 9, the fair
     value of $21.70 per share of Ariba common stock is based on Ariba's average closing price per

27   share as reported on NASDAQ for each trading-day during the period beginning two days before
     and ending two days after January 23, 2004, the merger announcement date, as adjusted for the

28   one-for-six reverse stock split effected on July 1, 2004.

1   stock from May 29, 2003 through February 7, 2005, inclusive (the "Class"). Excluded from the

2   Class are defendants herein, members of the immediate families of each of the defendants, any

3   person, firm, trust, corporation, officer, director or other individual or entity in which any defendant

4   has a controlling interest or which is related to or affiliated with any of the defendants, and the legal

5   representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

6      77.    This action is properly maintainable as a class action for the following reasons:

7      (a)    The Class is so numerous that joinder of all Class members is impracticable. As of

8   April 30, 2005, Ariba had approximately 66 million shares outstanding, and an average of 675,152

9   shares of Ariba stock traded daily. Members of the Class are scattered throughout the United States.

10     (b)    There are questions of law and fact which are common to members of the Class and

11   which predominate over any questions affecting only individual members. The common questions

12   include, *inter alia*, the following:

13        (I)    Whether the defendants' acts as alleged herein violated the federal securities

14   laws;

15        (ii)   Whether defendants participated in and pursued the common course of

16   conduct complained of herein;

17        (iii)  Whether documents, SEC filings, press releases and other statements

18   disseminated to the investing public and Ariba's common stockholders during the Class Period

19   misrepresented material facts about the operations, financial condition and earnings of Ariba;

20        (iv)   Whether the market prices of Ariba stock during the Class Period were

21   artificially inflated due to material misrepresentations and the failure to correct the material

22   misrepresentations complained of herein; and

23        (v)    To what extent the members of the Class have sustained damages and the

24   proper measure of damages.

25     (c)    Plaintiffs' claims are typical of the claims of other members of the Class and plaintiffs

26   have no interests that are adverse or antagonistic to the interests of the Class.

27     (d)    Plaintiffs are committed to the vigorous prosecution of this action and have retained

28   competent counsel experienced in litigation of this nature. Accordingly, plaintiffs are an adequate

1   representative of the Class and will fairly and adequately protect the interests of the Class.

2       (e)    Plaintiffs anticipate that there will not be any difficulty in the management of this

3   litigation as a class action.

4       78.    For the reasons stated herein, a class action is superior to other available methods for

5   the fair and efficient adjudication of this action and the claims asserted herein. Because of the size

6   of the individual Class members' claims, few, if any, Class members could afford to seek legal

7   redress individually for the wrongs complained of herein.

8                                   **COUNT I**

9                  **For Violation of Section 10(b) of the Exchange Act**

10          **and Rule 10b-5 Promulgated Thereunder Against All Defendants**

11      79.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth

12  herein.

13      80.    This Count is brought by plaintiffs pursuant to §10(b) of the Exchange Act and Rule

14  10b-5 promulgated thereunder by the SEC against all defendants.

15      81.    The defendants: (a) employed devices, schemes, and artifices to defraud; (b) made

16  untrue statements of material fact and/or omitted to state material facts necessary in order to make

17  the statements made not misleading; and (c) engaged in acts, practices, and a course of business

18  which operated as a fraud and deceit upon the purchasers of Ariba stock in an effort to maintain

19  artificially high market prices for Ariba stock in violation of § 10(b) of the Exchange Act and Rule

20  10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged

21  herein and/or as controlling persons as alleged below.

22      82.    In addition to the duties of full disclosure imposed on the defendants by their status

23  as controlling persons of Ariba, as a result of their affirmative statements and reports, or participation

24  in the making of affirmative statements and reports to the investing public, defendants had a duty

25  to promptly disseminate truthful information that would be material to investors in compliance with

26  the integrated disclosure provisions of the SEC as embodied in SEC regulations S-X (17 C.F.R.

27  §210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate

28  and truthful information with respect to Ariba's stock, operations, financial condition and earnings

---

1  so that the market price of Ariba stock would be based on truthful, complete and accurate
2  information.

3      83.     Defendants, individually and in concert, directly and indirectly, by using the means
4  and instrumentalities of interstate commerce and/or of the mails, engaged and participated in a
5  continuous c ourse o f conduct to c onceal a dverse m aterial i nformation a bout t he b usiness a nd
6  operations of Ariba as specified herein. The defendants employed devices, schemes and artifices to
7  defraud, while in possession of material adverse non-public information and engaged in acts,
8  practices, and a course of conduct as alleged herein in an effort to assure investors of Ariba's value
9  and performance, which included the making of, or the participation in the making of, untrue
10 statements of material facts and omitting to state material facts necessary in order to make the
11 statements made about Ariba and its business operations, in light of the circumstances under which
12 they were made, not misleading, as set forth more particularly herein, and engaged in transactions,
13 practices and a course of business which operated as a fraud and deceit upon the purchasers of Ariba
14 stock during the Class Period.

15     84.     The primary liability and controlling person liability of defendants arises from the fact
16 that during the Class Period, the defendants engaged in a scheme to conceal Ariba's patent violations
17 in order to prevent any ensuing decline in the price of Ariba stock (so that defendants could sell
18 insider holdings at artificially inflated prices and so as not to disturb Ariba's pending acquisition of
19 FreeMarkets).

20     85.     The defendants had actual knowledge of the misrepresentations and omissions of
21 material facts set forth herein. Such defendants' material misrepresentations or omissions were done
22 knowingly and for the purpose and effect of concealing Ariba's violations and liabilities from the
23 investing public and supporting the artificially inflated price of their stock. Indeed, a jury, following
24 a lengthy trial, found Ariba's conduct to have been "willful."

25     86.     As a result of the dissemination of the materially false and misleading information
26 and failure to disclose material facts by all defendants, as set forth above, the market price of Ariba
27 stock was artificially inflated during the Class Period. In ignorance of the fact that the market price
28 for Ariba stock was artificially inflated, and relying directly or indirectly on the false and misleading

1    statements made by defendants, or upon the integrity of the market in which the shares trade, and the

2    truth of any representations made to appropriate agencies and to the investing public, at the times

3    at which any statements were made, and/or on the absence of material adverse information that was

4    known by defendants but not disclosed in public statements by defendants during the Class Period,

5    plaintiffs and the other members of the Class acquired Ariba stock during the Class Period at

6    artificially high prices and were damaged when the shares declined in price in reaction to disclosures

7    of Ariba's willful patent infringement.

8        87.    At the time of said misrepresentations and omissions, plaintiffs and other members

9    of the Class were ignorant of their falsity and believed them to be true. Had plaintiffs and the other

10   members of the Class and the marketplace known of the true financial condition and business

11   prospects of Ariba, which were not disclosed by defendants, plaintiffs and other members of the

12   Class would not have purchased Ariba stock during the Class Period, or, if they had purchased such

13   stock during the Class Period, they would not have done so at the artificially inflated prices which

14   they paid.

15       88.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and

16   Rule 10b-5 promulgated thereunder.

17       89.    As a direct and proximate result of the wrongful conduct of the defendants, plaintiffs

18   and the other members of the Class suffered damages in connection with their purchases of Ariba

19   stock during the Class Period.

**COUNT II**

**For Violation of Section 20(a) of the Exchange Act Against All Defendants**

22       90.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

23       91.    Defendants acted as controlling persons of Ariba within the meaning of § 20(a) of the

24   Exchange Act as alleged herein. By virtue of their high-level positions, substantial stock holdings,

25   participation in and/or awareness of Ariba's operations and/or intimate knowledge of its internal

26   financial condition, business practices, products and the actual progress of development and

27   marketing efforts, the Individual Defendants had the power to influence and control and did

28   influence and control, directly or indirectly, the decision-making of Ariba, including the content and

dissemination of the various statements which plaintiffs contends are false and misleading. Ariba controlled the Individual Defendants and all of its employees. Each of the Individual Defendants was provided with or had unlimited access to copies of Ariba's internal reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Defendants had direct involvement in or intimate knowledge of the day-to-day operations of Ariba and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

92.     As set forth above, defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants are liable pursuant to § 20(a) of the Exchange Act.

93.     As a direct and proximate result of the wrongful conduct of defendants, plaintiffs and other members of the Class suffered damages in connection with their purchases of Ariba stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs, on behalf of themselves and the Class, prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding plaintiffs and other members of the Class damages together with interest thereon;

C.     Awarding plaintiffs and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.     Awarding plaintiffs and other members of the Class such equitable/injunctive and/or other and further relief as may be just and proper under the circumstances.

1

## JURY DEMAND

2          Plaintiffs demand a trial by jury.

3  Dated: November 30, 2006

4                                                    Respectfully submitted,

5                                                    *S/Michael Goldberg*

6                                                    GLANCY  BINKOW  &  GOLDBERG LLP
                                                     Lionel Z. Glancy (Bar No. 134180)
7                                                    Michael Goldberg
                                                     1801 Ave. of the Stars, Suite 311
8                                                    Los Angeles, California  90067
                                                     (310) 201-9150
9
                                                     KIRBY McINERNEY & SQUIRE, LLP
10                                                   Ira M. Press
                                                     Mark A. Strauss (Bar No. 196471)
11                                                   Beverly Tse (Bar No. 237240)
                                                     830 Third Avenue
12                                                   New York, New York  10022-3903
                                                     (212) 371-6600
13
                                                     MURRAY FRANK & SAILER, LLP
14                                                   Brian Murray
                                                     275 Madison Avenue, Suite 801
15                                                   New York, New York 10016
                                                     (212) 682-1818
16
17                                                   *Co-Lead Attorneys for Plaintiffs*

18                                                   KAUFMAN & CANOLES, PC
                                                     Mark C. Shuford
19                                                   Three James Center
                                                     1051 East Cary Street
20                                                   12th Floor, PO Box 27828
                                                     Richmond, Virginia 23261
21                                                   (804) 771-5700

22                                                   *Additional Counsel for Plaintiffs*

23

24

25

26

27

28

**PROOF OF SERVICE BY ELECTRONIC POSTING**
**PURSUANT TO NORTHERN DISTRICT OF CALIFORNIA LOCAL RULES AND**
**ECF GENERAL ORDER NO. 45**
**AND BY MAIL ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

On November 30, 2006, I served the following by posting such documents electronically to the ECF website of the United States District Court for the Northern District of California:

    1    **AMENDED COMLAINT FOR VIOLATIONS OF FEDERAL**
           **SECURITIES LAWS**

on all ECF-registered parties in the action and, upon all others not so-registered but instead listed below, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at Los Angeles, California. They are:

**SEE SERVICE LIST**

Executed on November 30, 2006, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

        *S/Kyaa Heller*
        Kyaa Heller

1

## SERVICE LIST

2

### Electronically To All ECF-Registered Entities

3

### By US Mail To All Known Non-ECF-Registered Entities

4

5 **FOR PLAINTIFFS**

6 Mark Campbell Shuford
Kaufman & Canoles
7 1051 E Cary Street
3 James Center, 12th Floor
8 Richmond, VA 23219
Telephone :    (804) 771-5700
9

10 **FOR DEFENDANTS**

11 Keith Richard Palfin
Shearman & Sterling LLP
12 801 Pennsylvania Avenue, NW
Washington, DC 20004
13 Telephone :    (202) 508-8000
Facsimile:    (202) 661-7333
14

15 Jonathan Richard DeFosse
Shearman & Sterling LLP
16 801 Pennsylvania Avenue, NW
Washington, DC 20004
17 Telephone :    (202) 508-8000
Facsimile:    (202) 661-7374

18 Ariba, Inc.
807 11th Avenue
19 Sunnyvale, CA 94089

20

21

22

23

24

25

26

27

28